IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>FOX NEWS NETWORK, LLC<br><br>Defendant. | CIVIL ACTION NO.<br>1:10-cv-01660-RJL |

## DECLARATION OF CATHERINE HERRIDGE

I, Catherine Herridge, do hereby state or declare as follows:

1. I am currently an on-air reporter for Fox News Network, LLC (hereinafter "Fox"). I began my employment with Fox on or around October 21, 1996, as an on-air general assignment news reporter with the London Bureau. In January of 1999, I was transferred to Fox's New York City Headquarters as an on-air reporter. Beginning in 2001, I have been an on-air reporter with the Washington, D.C. Bureau. My employment is governed by an employment contract which has a three year term.

2. In or around July 2006, I contacted CEO Roger Ailes and complained that Bill Shine, Senior Vice-President for Programming at Fox was refusing to honor Fox's agreement that I receive a "trial run" as an Anchor. I was suspicious that it was not being honored because of my sex, female and age, then 42.

3. Around November 20, 2006, I questioned Bruce Becker, Acting Washington, DC. Bureau Chief about why less desirable shifts (e.g., early morning, late night, and weekends) were

routinely given to female and black correspondents.

4. Around January 8, 2007, I personally met with Fox's CEO Roger Ailes because he was about to select a new Bureau Chief. I told CEO Ailes that I was concerned about the unfair treatment of women in the Washington, D.C. Bureau. After the meeting CEO Ailes asked me to follow up with an e-mail. In the e-mail I told CEO Ailes that he needed a manager who would implement company HR Policy as well as other financial and employment rules. To my knowledge no investigation about my concerns was conducted and I did not observe a change in to the office's practices.

5. I did receive a trial run as a Weekend Anchor in the Fall of 2006 which ended in or around the Fall of 2007. At the time that the trial run ended, I was reassigned from Anchor to Reporter. Fox informed me that I was being removed because the station wanted to do more light news and entertainment. However, within weeks of my removal, Fox placed a male in the Weekend Anchor position and he appeared to be anchoring the weekend segment in the same direction it was when I was the Anchor.

6. On or around December 4, 2007, I complained to D.C. Bureau Chief, Brian Wilson that I believed I was demoted from Anchor to Reporter, and that assignments were being taken away from me because of my age (then 43), sex (female) and because of my prior opposition to discrimination. On or around December 10, 2007, I also complained to Fox's Senior Vice-President for Legal and Business Affairs, Dianne Brandi that I was being discriminated against because of my age and sex when Fox removed me from the Anchor position.

7. Beginning in or around December 2007, Senior VP Brandi began an internal investigation on behalf of Fox, into the allegations of discrimination that I made.

8. Around January 15, 2008, I restated my age and sex discrimination complaint to Ms.

Brandi. Ms. Brandi told me that if I did not like how things were going that I was free to go the the EEOC. Later, around February 7, 2008, I e-mailed Ms. Brandi and questioned her about her investigation and expressed concerns that Ms. Brandi's investigation was neither thorough nor impartial. Ms. Brandi had informed me that she had promised to keep CEO Ailes fully informed about her investigation into my discrimination complaint. The next day, February 8, 2008, CEO Ailes sent a company-wide email (the email was sent to the entire company, not just the D.C. Bureau). In pertinent part, the e-mail states:

> "...The best things about those days [the early days of Fox] were the...lack of complaints...But today I sometimes hear too much selfish complaining, petty whining, and a desire to have what someone else has... As I have always said, negative people make positive people sick...you should note that there are no locks on the outside of the doors keeping us here. I would never want to hold anyone back. I decided many years ago that I did not ever want to work with unhappy people because life is too short and the first 100 years in the ground is just the beginning...If you are happy, your work experience will be fulfilling and your colleagues will like you. If you are not happy, your fellow employees will avoid you.... Some people actually find it easier to achieve success than to handle it well once they have it.

I received the email and felt that it was in direct response to my continued complaints of age and sex discrimination. I also believed that it was meant to silence me. However, I did not confront CEO Ailes about the e-mail to confirm my suspicion because I was intimidated by the e-mail and since Ms. Brandi had previously instructed me not to contact CEO Ailes directly regarding my complaint or the investigation.

9. On or about March 17, 2008, Ms. Brandi notified me that she had completed her investigation and provided to me a copy of her draft report. Ms. Brandi concluded that there was no evidence of discrimination. I disputed Ms. Brandi's findings and renewed my discrimination complaints. To my knowledge none of the witnesses I had identified were interviewed. I told Ms. Brandi that I felt the outcome of the investigation was predetermined. I also felt that Ms. Brandi

was charged with investigating her own bad acts.

10. My employment contract with Fox was set to expire in October 2008. Prior to the expiration of the term of the 2005 contract, I, through my agent, engaged in negotiations with Ms. Brandi for the upcoming 2008 contract term. Around August 2008, Ms. Brandi forwarded a draft proposal for the 2008 employment contract. It was very similar to my previous contract but contained several new paragraphs which I believed to be illegal and an effort by Fox to link my future employment to my having made prior complaints of discrimination and ceasing that practice. First, language was inserted by Ms. Brandi that I would never serve as an Anchor/Co-Anchor or an occasional Anchor/Co-Anchor during the contract term unless Fox at its sole discretion decides otherwise. I had previously complained to Ms. Brandi and the CEO Ailes that my removal from the Anchor position was discriminatory. Second, Ms. Brandi inserted language in the proposed contract that stated that both I and Fox acknowledged that [Herridge] "has raised allegations of discrimination in the past concerning her non-assignment to anchor positions and concerning other matters, and that Fox has investigated" my allegations. I and "Fox also acknowledge that Fox has determined that discrimination did not occur and that [I] did not agree with Fox's determination." I also had concerns about the salary and equal pay, but was more concerned with the language referencing my EEO complaints. I viewed the disputed language as illegal, offensive, and as an attempt by Fox to cover-up its inadequate investigation of my discrimination complaints by Ms. Brandi. I also viewed this language as an attempt to intimidate and silence me.

11. On August 15, 2008, my agent informed Fox that I would not accept the proposal and pointed out that my having filed an internal EEO complaint and contract renewal were separate issues and should be treated as such. Fox was also presented with a counter demand to its

proposed salary offer. Throughout the contract negotiations I continued to stand firm on my belief that the language was retaliatory and an attempted cover-up. However, my objection was dismissed by Ms. Brandi who characterized the reference to my EEO complaint as "simply a recitation of the facts."

12. Fox did not address my salary concerns other than to say it might consider increasing the amount. It was my position that I deserved to be equitably compensated for my work which is my right under the law. The salary demand was supported by information regarding the quality and quantity of my work including the three beats that I covered (Homeland Security, Department of Justice and the Intelligence community), my 21 years of journalistic experience which includes a Masters Degree in Journalism from Columbia University, salary data provided to me by Ms. Brandi of my near peers, and projected costs to replace me. I invited Fox to present its own facts and figures to dispute the salary demand. Fox did not present its own facts to refute the salary demand but rather went ballistic and accused me of extortion when I was only seeking equal pay for my work. Additionally, Fox did not remove the disputed language from the contract. In September 2008, I filed a charge of discrimination with the EEOC.

13. I went back and forth with Fox throughout most of the Fall of 2008, with Fox refusing to counter my salary demand and refusing to drop the disputed language, and me insisting that the language be dropped. Sometime in November 2008 contract negotiations stalled. Fox stopped responding to e-mails from my agent which invited Fox to submit a counter-proposal.

14. My agent had sent an e-mail to Ms. Brandi on March 5, 2009 to which there was no response by Ms. Brandi. On or about May 6, 2009, my agent received an e-mail from Ms. Brandi which came out of the blue. Ms. Brandi stated that Fox would get a counter-offer to me by the end of that week. On May 8, 2009, I received Fox's counter-offer, which did not contain

the disputed language. I was not able to immediately provide a response because my agent was on vacation and I was preparing for an assignment at Guantanamo Bay. On May 29, 2009, I, through my agent, told Fox that I would accept the salary terms and contract conditions. On June 4, 2009, Fox and I agreed to the final provisions of the contract and I signed the contract on June 18, 2009. The final terms of the contract, include the original monetary offer made by Fox absent the proposed language regarding that I would work as an Anchor at the sole discretion of Fox and it did not mention my allegations of discrimination. After the contract was signed, Fox paid me the lost compensation for the nine months I worked without a contract. The amount of lost wages did not include interest.

15.   After I complained internally about the discriminatory management practices at Fox, I was marginalized. My reporting, gathered from my contacts built up over 8 years in Washington, and stories in my assigned beats of Intelligence, Homeland Security and the Justice Department were handed off to my white male colleagues or my younger female colleagues to broadcast as their own reporting. In January 2009, the Washington D.C., Bureau Manager Bryan Boughton, in my first ever written counseling or performance review in 12 years at Fox, gave me a "final warning." Mr. Boughton issued the "final warning" after I questioned why my news reporting was given to a male Correspondent to broadcast on the network as his own work. These actions violated basic journalistic principles. I was taught at Columbia School of Journalism that this was unethical. The warning indicated that I could be fired at any time. I had never received any prior disciplinary warnings or written counseling. I disputed the final warning and told Fox's representatives, including Ms. Brandi that I believed that the final warning was in direct response to my EEOC charge of discrimination.

16. During the nine months that I worked without a contract, I was paid at the 2005 contract salary rate. I maintained my health benefits. However, not having an employment contract meant that I worked without any protection. Fox could have fired me at anytime, and in fact threatened to do so when Mr. Boughton issued the "final warning." I would have lost my health benefits, salary, etc., 30 days after notice of termination. I am the primary breadwinner in my family. I feared termination and feared losing health benefits for myself, my husband who is a Major in the Air Force and my two young children. I have a child who suffers from a rare liver disease that required a transplant and a tremendous amount of medical care. I was in constant fear of being fired and losing my health benefits and salary, and thus being unable to properly care for my children especially my child with the serious medical condition. Fox was aware of my child's medical condition because Fox broadcasted multiple news stories about my liver donation for my son's transplant. Fox's media relations department actively sought favorable news coverage on our family's story.

This declaration is submitted pursuant to the requirements of 28 U.S.C. § 1746. I declare, under penalty of perjury, that the foregoing is true and correct.

_____
Catherine Herridge

Executed on November 19, 2010